THE STATE OF OHIO, APPELLEE, *v.* SHORT, APPELLANT.

[Cite as *State v. Short,* 129 Ohio St.3d 360, 2011-Ohio-3641.]

*Criminal law — Aggravated murder — Death penalty upheld.*

(No. 2006-1366 — Submitted April 5, 2011 — Decided July 28, 2011.)

APPEAL from the Court of Common Pleas of Montgomery County,

No. 2004 CR 02635.

_____

LANZINGER, J.

{¶ 1}   This is an appeal as of right by defendant-appellant, Duane Short. A jury found Short guilty of the aggravated murders of Rhonda Short and Donnie Sweeney.  He was sentenced to death for both offenses.

**Factual Background**

{¶ 2}   Evidence introduced at trial showed that Duane and Rhonda Short were married and lived on Staton Street in Lemon Township, Middletown, Ohio, with their three children, Justin, Tiffany, and Jesse (born in 1990, 1992, and 1995 respectively).  Short worked as a meat cutter for McGee Supermarket.

{¶ 3}   There was testimony at trial that Rhonda Short attended church and taught Sunday school at the Faith Baptist Church in Miamisburg.  There was also testimony that she became acquainted there with Brenda Barian and Donnie Sweeney, Barian's son, both of whom also taught Sunday school at Faith Baptist. Barian described her relationship with Rhonda as "very close.  [Rhonda] was like a daughter to" her.  Tiffany testified that Rhonda and her children sometimes went out for ice cream with Barian and Sweeney after church.  Jesse recalled that he, Rhonda, and Tiffany had once gone to a McDonald's in Miamisburg with Sweeney and others after church.

**{¶ 4}**   The prosecution introduced evidence that during the two months preceding the offenses, Short made several statements about intending to kill Rhonda if she left him.  Rhonda's friend Amy Spurlock testified that "[a]bout one or two months before" Rhonda's death, Short showed Rhonda a newspaper article about a husband who had murdered his wife after she left him.  Spurlock's testimony described how Short waved the article around angrily and "tr[ied] to push it in her face."  According to Spurlock, Rhonda refused to read the article, so Short read it aloud to her and had then said, "[L]ook what happens if you ever leave me or cheat on me, then I'll kill you, the kids and myself."

**{¶ 5}**   Short's supervisor, Robert Thomas, testified that "[a] couple months before the shooting," he and Short had a conversation "about relationships, marriage and divorce * * * in general."  According to Thomas, Short said: "I don't think I'd be able to handle it * * *.  [I]f my wife would ever leave me for another man * * * I would shoot both of 'em and then kill myself."

**{¶ 6}**   Tiffany Short testified that in July 2004, she overheard her father tell her mother: "If you ever leave, I'll kill you."  Brandon Fletcher, a member of the Faith Baptist congregation, testified about a conversation he had had with Short on or about July 8, 2004.  Fletcher told Short that he had seen Sweeney "kinda hugging" Rhonda in the basement at Faith Baptist Church, that it "wasn't right," and that Fletcher "didn't like what [he] saw."  According to Fletcher, he also told Short that "Rhonda would leave [church] first and then Donnie would follow her."  Fletcher testified that Short "was upset by finding out that his wife was possibly involved with another guy."

**{¶ 7}**   Witnesses testified that on July 15, 2004, Rhonda Short moved out of the house on Staton Street.  She took Tiffany and Jesse, the two younger children, with her.  She did not take Justin; in his trial testimony, Justin explained that he had wanted to stay with his father.  According to Justin, Rhonda left a note for Short that "said basically that she was leaving him."  Justin testified that he

gave his father the note when his father came home from work that day. Upon reading the note, Short became "[u]pset and maybe angry." Short then got into his truck with Justin and searched for Rhonda and continued to search for her during the ensuing week.

{¶ 8} Brenda Barian testified that Rhonda went to Barian's house on July 15, and Barian took her to a hotel. At trial, Barian recounted how over the next five days, Rhonda stayed at three hotels and also spent time at Barian's house. Barian testified that she had paid for Rhonda's hotel stays while helping her find a place to live. On Saturday, July 17, Barian found a house available for rent at 5035 Pepper Drive in Huber Heights, Ohio. On the following Monday, July 19, Rhonda opened an account with the Dayton Power and Light Company ("DP&L") for service at 5035 Pepper Drive. Barian testified, and DP&L records corroborate, that Rhonda opened this account under her maiden name, Rhonda Dalton. The next day, Barian testified, she drove Rhonda and the two children to the house and helped them move in.

{¶ 9} Robert Thomas testified that on July 19 or 20, Short told him that Rhonda had left him, that he was "really down," and that he "just wanted to die." According to Thomas, "[t]hat's all [Short] talked about" that day. Thomas described Short as "tearful" and "run down." Short was unable to work and left early. Short's cousin, Loren Taylor, testified that he encountered Short and Justin on the night of July 21 at the Abundant Life Tabernacle in Germantown, Ohio. Short said: "Rhonda left me. * * * I think she left me for another man." According to Taylor, during this conversation, Short raised his fist and stated that he had "thought about going over there and killing him."

### The Events of July 22, 2004

{¶ 10} Robert McGee, who owns the McGee Supermarket, testified that Short came to work July 22. According to McGee, Short complained that he

would be unable to keep his home if he had to pay child support. Short left work that day at 2:30 p.m., McGee testified.

{¶ 11} Telephone records introduced at trial indicate that Short phoned DP&L and spoke with a customer service representative ("CSR") around 3:30 p.m. on July 22, 2004. A recording of the call was introduced at trial and shows that Short gave Rhonda's Social Security number to the CSR and asked whether there were any accounts under Rhonda's name. DP&L computer records introduced at trial indicate that the CSR had found a newly opened account under the name of Rhonda Dalton at 5035 Pepper Drive. During her conversation with Short, the CSR mentioned that address.

{¶ 12} That afternoon, according to Justin, Short went to Huber Heights. Justin was with him. They stopped at a real-estate office. The real-estate agent in the office testified that Short had asked her for a map of Huber Heights. She did not have such a map, but offered to look up an address for him on the Yahoo maps website. Short gave her the Pepper Drive address. The agent testified that she entered the address, found a map online, printed it, and gave it to Short. She described Short's demeanor as "calm" and "normal."

{¶ 13} Brandon Fletcher testified that on July 22, he was visiting a friend who lived across the street from Short. Around 6:00 p.m., Justin came over and said Short wanted to talk to him. According to Fletcher, "a couple weeks" before July 22, Short had discussed the possibility of buying a 12-gauge shotgun from him. When Fletcher arrived at Short's house, Short asked him whether he still wanted to sell the gun.

{¶ 14} Fletcher testified that he knew that Rhonda had left Short. In light of Short's emotional state, Fletcher testified, he felt that he should not provide him with a gun. He therefore told Short, falsely, that he had already sold it. Fletcher stated that Short put his fist against the wall and said, "I don't know what I've done to her to deserve this."

4

{¶ 15} According to telephone records introduced by the state at trial, Short phoned Robert McGee at 6:28 p.m. McGee testified that Short asked to borrow the store's truck to move some furniture, and McGee gave permission. Justin testified that Short drove his own truck to McGee's store in Trenton, bringing Justin with him. Short left his truck there; he and Justin went home in the store's truck. The evidence in the record indicates that the store's truck did not resemble Short's. According to trial testimony, Short's truck was a small Jeep, variously described as either gray, blue with "gray primer on it," or "a faded out black color." Testimony and photographs introduced at trial show that the store's truck was a white Ford F250.

{¶ 16} The telephone records indicate that at 7:30 p.m., Short phoned Dick's Sporting Goods store at the Dayton Mall. Justin said that Short asked about buying a shotgun. Justin testified that after Short hung up, he and Justin drove to the store. (Charles Taylor, a Huber Heights detective, testified that this was about a 20–mile drive.) According to Justin, Short brought along a towel, a pair of gloves, a black raincoat, two hats, and boxes of 20-gauge shotgun ammunition.

{¶ 17} At trial, the prosecution introduced sales records and a security-camera videotape that documented Short's purchase of a 20-gauge shotgun at Dick's Sporting Goods on the night of July 22. The receipt indicates that the sale took place at 8:46 p.m. According to Justin, Short told him he was buying the gun for hunting.

{¶ 18} Justin testified that they went to a nearby Meijer store to buy a hacksaw. (Detective Taylor testified that the store was about two miles from Dick's Sporting Goods.) At trial, the state introduced business records and a security-camera video from the Meijer on Springboro Pike, Dayton, which documented Short's purchase of a hacksaw at 9:04 p.m.

**{¶ 19}** Justin testified that from Meijer, Short drove to Huber Heights. Using the map provided by the real-estate agent, Short located 5035 Pepper Drive and "circled around" the area for a time. According to Justin, Short put on a hat and told Justin to do the same, so Rhonda would not recognize them if she saw them. He then went to a Huber Heights motel and rented a room.

**{¶ 20}** Justin testified about Short's actions at the motel. His father carried the shotgun and hacksaw inside, posted the do-not-disturb sign, closed the door, and turned up the television so nobody could hear what he was doing. He then sawed off the shotgun's barrel. He tried to saw off the stock as well, but was unable to do so. Justin testified that while this was going on, he entreated his father to talk to Donnie, or even fight him, rather than shoot anyone. But Short merely replied, "[N]o – I have to do this."

**{¶ 21}** Justin testified that with these preparations completed, he and his father got into the truck, taking along the sawed-off shotgun, the barrel, and the hacksaw. Short drove back to Rhonda's neighborhood and parked on a side street ending directly in front of 5035 Pepper Drive. Short donned a black raincoat and got out of the truck. He approached 5035 Pepper Drive and went to the back of the house. Then he returned to the truck. He picked up some shotgun shells and hid the shotgun under his raincoat.

**{¶ 22}** According to Justin, Short said that he would "probably go to prison for this." He told Justin he loved him and warned him to keep his head down so he "wouldn't get shot." Short then went to the rear of 5035 Pepper Drive. Justin testified that he then heard a gunshot.

**{¶ 23}** Short's daughter, Tiffany, testified that on July 22, 2004, she and her brother Jesse were watching television, Rhonda was taking a shower, and Donnie Sweeney was cooking dinner on the patio behind the house. Tiffany heard voices outside. She and Jesse testified that they went to the kitchen to look

out the rear window, but it was too dark outside to see. According to Tiffany, Sweeney said, "[N]o, man, please stop." Then they heard a loud noise.

{¶ 24} The children testified that Jesse began to open the back door. Short then pushed it open with enough force to shove the children away from it. When their father entered the house, both children saw that he was carrying a gun. Tiffany testified that she had said, "Dad, stop," but Short did not acknowledge her or Jesse.

{¶ 25} The children ran out of the house through the back door. Tiffany testified that as she fled, she heard another loud noise from inside the house. Tiffany testified that as they ran through the back yard, she noticed a person lying on the ground.

{¶ 26} They ran to the nearby home of Donovan and Janet Patrick, who let them inside. The Patricks testified that the children, who arrived just before 10:30 p.m., were screaming, crying, and trembling. Tiffany told them that her father "had shot her mother and her mother's friend." Janet called 9-1-1.

{¶ 27} Justin testified that after he heard a loud noise, his father ran back to the truck, placed the gun inside, and told Justin that "he [thought] he [had] just killed [Justin's] mom and Donnie."

{¶ 28} Short drove to a nearby convenience store, got out, talked to a woman, got back into the truck, and drove back to Pepper Drive, where he and Justin entered the house from the back. Justin saw Sweeney lying in the back yard, not moving. Inside the house, Justin saw his mother "sitting * * * at a chair at the [kitchen] table * * * [with] a towel over her * * * stomach."

{¶ 29} At 10:27 p.m., Huber Heights police responded to Janet's 9-1-1 call. They arrested Short, who offered no resistance, and took him to the police station.

{¶ 30} Paramedics were dispatched to 5035 Pepper Drive at 10:28 p.m. One of the paramedics testified that he examined Sweeney, who was lying in the back yard, and pronounced him dead.

{¶ 31} In the kitchen, the paramedics found Rhonda Short lying on her back. She was still alive, but she had a bloody hole in her chest, about one and one-half inches in diameter, and appeared to be in severe pain. "She said that she couldn't breathe and * * * that it hurt so bad."

{¶ 32} The paramedics took Rhonda to the hospital. According to the paramedics, Rhonda kept repeating such statements as "[I]t hurts so bad," "I can't breath[e]," "I think I'm gonna die," and "[H]e shot me." Rhonda died at 4:38 a.m., July 23, 2004.

{¶ 33} Dr. Lee Lehman, the chief deputy coroner of Montgomery County, testified that he performed autopsies on Rhonda Short and Donnie Sweeney on July 23, 2004. Lehman concluded that each victim died of a shotgun wound to the chest.

{¶ 34} On July 28, Huber Heights police officers examined the crime scene. Evidence technician Matthew Blair testified that although the bathroom door was open, the doorknob was in the locked position, and the lock was broken, with pieces of the locking mechanism lying on the bathroom floor. Blair further testified that a shoeprint was visible on the exterior of the bathroom door, adjacent to the knob.

{¶ 35} Short was indicted on three counts of aggravated murder. One count charged him with the aggravated murder of Donnie Sweeney with prior calculation and design under R.C. 2903.01(A); one count charged him with the aggravated murder of Rhonda Short with prior calculation and design under R.C. 2903.01(A); and one count charged him with committing the aggravated murder of Rhonda Short while committing aggravated burglary under R.C. 2903.01(B). Each aggravated-murder count carried two death specifications: multiple murder,

R.C. 2929.04(A)(5), and felony murder predicated on aggravated burglary, R.C. 2929.04(A)(7).

{¶ 36} The indictment also charged Short with one count of breaking and entering, R.C. 2911.13(B); one count of aggravated burglary, R.C. 2911.11(A)(2); and one count of possession of dangerous ordnance (the sawed-off shotgun), R.C. 2923.17(A). Each count of the indictment carried a firearm specification under R.C. 2941.145.

{¶ 37} The jury found Short guilty of all counts and specifications. Short chose not to present evidence in the penalty phase. After hearing the arguments of counsel in the penalty phase, the jury recommended death sentences on all three counts of aggravated murder. The trial court, after merging the counts dealing with the aggravated murder of Rhonda Short, sentenced Short to death on the remaining two counts.

{¶ 38} In this appeal, Short raises 14 propositions of law.

### I. Waiver of Mitigation

{¶ 39} In his first proposition of law, Short contends that his waiver of the right to present evidence in the penalty phase was not knowing and voluntary and hence was invalid.

*A. The Trial Court's* Ashworth *Inquiry*

{¶ 40} In January 2005, about 16 months before trial, Short first expressed an interest in waiving mitigation. He asked the trial court's permission to withdraw a motion to suppress, change his plea to guilty, and proceed "without any mitigation." At defense counsel's request, the trial court ordered a psychological evaluation pursuant to *State v. Ashworth* (1999), 85 Ohio St.3d 56, 706 N.E.2d 1231. The next month, the clinical psychologist's report concluded, "Mr. Duane Short is currently competent * * * to Waive Presentation of Mitigating Factors for Sentencing."

**{¶ 41}** Then, on the day the penalty phase began, the trial court addressed defense counsel as follows: "[I]t's my understanding * * * that the Defendant * * * does not intend to present any additional * * * mitigating evidence other than that which was presented in the trial phase, is that correct?" Defense counsel affirmed that that was correct.

**{¶ 42}** The trial court asked counsel whether they had discussed with Short "his right to present mitigation evidence" and had explained "what mitigation evidence consists of." Counsel reported that they had done so, and also that they had "made a thorough investigation of mitigating evidence * * * including inquiries of family members and other persons."

**{¶ 43}** The trial court then addressed Short, stating: "It's my understanding * * * that you * * * did not want then and you do not want now any additional assistance in the presentation of mitigating evidence * * *." Short replied: "That's correct." Short affirmed that he had consulted with his counsel about mitigation and that they had "fully explained" it to him.

**{¶ 44}** The court also delved into Short's specific understanding of mitigation. Short explained in his own words what he understood mitigation to mean and why it was important: mitigation meant "factors that could result in causing the jury to sway the case to give me more of a possibility of * * *a more in-depth look into what happened and possibly * * * a lighter sentence." Short told the court that it was important: "[I]t would give the jurors, like I said, for a more indef [sic] – perspective than them just considering what the prosecution had presented to weigh more accurately their sentencing phase, I guess."

**{¶ 45}** The court explained to Short that the defense had the burden of going forward with evidence of mitigating factors, while the state had the burden of proving that the aggravating circumstances outweighed the mitigating factors, and that a death sentence could be imposed only if the prosecutor met its burden. Short said he understood.

{¶ 46} The court asked Short whether he understood that without evidence in mitigation, "it may be difficult * * * for the jury to impose anything other than the death sentence." Short emphatically affirmed that he understood: "I certainly do." Later in the colloquy, he restated in his own words: "[I]t could very well cost me my life if I don't put on any mitigation. I understand that fully."

{¶ 47} In a written decision, the trial court made the following findings:

{¶ 48} (1) Short understood the choice between life and death;

{¶ 49} (2) He had the ability to make a knowing and intelligent decision not to present mitigating evidence;

{¶ 50} (3) He fully understood the ramifications of that decision;

{¶ 51} (4) He had the ability to reason logically;

{¶ 52} (5) He understood his right to present mitigating evidence;

{¶ 53} (6) He understood the meaning of mitigating evidence;

{¶ 54} (7) He understood the importance of mitigating evidence;

{¶ 55} (8) He understood the use of mitigating evidence to offset the aggravating circumstances;

{¶ 56} (9) He understood the effect of failing to present mitigation.

{¶ 57} Short did not present any mitigating evidence to the jury in the penalty phase. However, his counsel did argue for a life sentence. Based on guilt-phase evidence, counsel argued that Short had committed the murders while suffering from severe emotional distress due to the breakup of his marriage, that he did not plan the murders in advance, and that his 38 years of life should not be judged exclusively on his actions during a seven-hour period.

*B. Short's Challenge to the Validity of His Waiver*

{¶ 58} Short argues that his waiver of mitigation was not knowing and voluntary, because his subsequent actions were inconsistent with waiving mitigation, thus demonstrating that he did not really want to waive it, and because

defense counsel had failed to investigate mitigation before the waiver. Short also argues that the trial court should have inquired more deeply into his competence to waive mitigation and his reasons for doing so. The state argues that the trial court was not required to conduct any inquiry in the first place, because Short actually did present mitigating evidence, albeit not in the penalty phase.

{¶ 59} This court has held that the right to present mitigating evidence is not a fundamental right that must be personally waived by the defendant. *State v. Keith* (1997), 79 Ohio St.3d 514, 530, 684 N.E.2d 47. Moreover, the Supreme Court of the United States has stated: "We have never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence. * * * [W]e have never required a specific colloquy to ensure that a defendant knowingly and intentionally refused to present mitigating evidence." *Schriro v. Landrigan* (2007), 550 U.S. 465, 479, 127 S.Ct. 1933, 167 L.Ed.2d 836. For this reason, the trial court has no constitutional duty to secure from the defendant an on-the-record waiver of the right to present mitigating evidence. *Keith* at 530.

*C. Short's Challenge to the Ashworth Colloquy*

{¶ 60} In *State v. Ashworth*, 85 Ohio St.3d 56, 706 N.E.2d 1231, paragraph one of the syllabus, we held: "In a capital case, when a defendant wishes to waive the presentation of *all* mitigating evidence, a trial court must conduct an inquiry of the defendant on the record to determine whether the waiver is knowing and voluntary." (Emphasis sic.) As part of the inquiry, the trial court must determine "whether the defendant understands his or her rights both in the plea process and in the sentencing proceedings." Id. at 62.

{¶ 61} *Ashworth* sets forth specific requirements for the colloquy: "The trial court must inform the defendant of the right to present mitigating evidence and explain what mitigating evidence is. The court must then inquire of the defendant, and make a determination on the record, whether the defendant understands the importance of mitigating evidence, the use of such evidence to

offset the aggravating circumstances, and the effect of failing to present that evidence. After being assured that the defendant understands these concepts, the court must inquire whether the defendant desires to waive the right to present mitigating evidence, and, finally, the court must make finding of fact as to the defendant's understanding and waiver of rights." Id. In addition, "[t]he trial court must decide whether the defendant is competent," but only if counsel so requests or if the defendant displays "any indicia of incompetence." Id.

{¶ 62} But the requirement of an *Ashworth* inquiry is triggered only "when a defendant wishes to waive the presentation of *all* mitigating evidence." (Emphasis sic.) *Ashworth* at paragraph one of the syllabus; see also *State v. Barton*, 108 Ohio St.3d 402, 2006-Ohio-1324, 844 N.E.2d 307, ¶ 51. The state contends that the defense did not waive the presentation of *all* mitigating evidence; therefore, the trial court was not required to conduct any inquiry to determine whether Short's waiver of mitigation was knowing and voluntary.

{¶ 63} The state's argument has merit. During the guilt phase, the defense had introduced mitigating evidence, to which counsel referred during the penalty phase. Specifically, the defense had attempted to show that Short was deeply emotionally distressed because Rhonda left him. Mike Rosenbalm, a Monroe, Ohio police officer and the sole witness in the defense case-in-chief, testified that he was dispatched to Short's house on July 16, and that Short was "very emotional [and] crying."

{¶ 64} In cross-examining prosecution witnesses, the defense elicited further testimony to support its claim of emotional distress. Justin Short testified on cross-examination that the police had come to the house one night after Rhonda's departure and had confiscated Short's gun, and that Short "went to a hospital." Justin further testified that his father had received disturbing phone calls, during which someone had played songs that upset him. Short's boss, Robert Thomas, testified on cross-examination that on the Monday or Tuesday

before the murders, Short was "tearful," appeared "run down," said he "just wanted to die," and was unable to work.

{¶ 65} During the cross-examination of Brandon Fletcher, the defense elicited that Fletcher had told Short about Sweeney and Rhonda "hugging" at church in a manner he considered inappropriate and that this news had upset Short. In cross-examining Short's cousin, Loren Taylor, concerning Short's July 21 visit to the Abundant Life Tabernacle, the defense stressed that Short was not a member of the congregation, but had attended the service and had gone up to the altar for prayer, implying that Short was taking unusual actions in an attempt to deal with strong emotions. Similarly, the defense elicited testimony from Justin that Short had attended services at four churches other than his own from July 15 to 22, and that the congregation at each one offered special prayers for him.

{¶ 66} Short's emotional distress over Rhonda formed the principal theme of the defense penalty-phase closing argument. The defense argument juxtaposed Justin's testimony with Officer Rosenbalm's to imply that Short had been suicidal. During closing arguments, the defense reminded the jury: "First day, Justin says, how did your dad seem very sad, very sad. Officer Rosenbalm is called out, he comes to the house. What did you find, Officer? * * * He was crying, he was depressed, I confiscated a gun."

{¶ 67} Defense counsel argued that Short had gone to several churches during the week before the murders because he "was crying for help the only way he knows. He goes to church. * * * [H]e's going from church to church to church trying to get some sort of help, trying to stop this stuff that he's been carrying around for two months. His life is gone, his wife is gone, the kids are gone, he has nothing, he goes to church."

{¶ 68} Using both the state's evidence and the testimony elicited by defense cross-examination, the defense argued that Short was "not a cold-blooded

person," but was "a mess," was "torn apart," and had "lost the battle with his demons" when he killed Rhonda and Sweeney.

{¶ 69} This case is analogous to *Barton*, 108 Ohio St.3d 402, 2006-Ohio-1324, 844 N.E.2d 307. In *Barton*, a capital defendant declined to present mitigating evidence in the penalty phase of his trial. Id. at ¶ 43. Although he did make an unsworn statement, his statement urged the jury to sentence him to death. Id. at ¶ 50. However, during the guilt phase, defense counsel "cross-examined several prosecution witnesses * * * and elicited mitigating testimony on [the defendant's] behalf." Id. at ¶ 49.

{¶ 70} On appeal, Barton argued that the trial court should not have accepted his waiver of mitigation without an *Ashworth* inquiry. We rejected Barton's claim: "We conclude that the evidence of mitigation presented during the guilt phase of trial as contained in the record, together with Barton's unsworn statement during the penalty phase of trial and defense counsel's closing argument, rendered *Ashworth* inapplicable to this case because Barton did not waive the presentation of all mitigating evidence." Id. at ¶ 52.

{¶ 71} Here, although Short did not make an unsworn penalty-phase statement, his counsel did elicit mitigating evidence in the guilt phase by cross-examining the state's witnesses. Moreover, counsel used that evidence in the penalty phase to argue that Short did not deserve death.

{¶ 72} *Barton* states: "Presentation of any mitigating evidence during *either* the guilt phase or the penalty phase of a capital-murder trial relieves the trial court of the duty to conduct an *Ashworth* inquiry." (Emphasis added.) 108 Ohio St.3d 402, 2006-Ohio-1324, 844 N.E.2d 307, paragraph two of the syllabus. Short did not forgo the presentation of all mitigating evidence. Clearly, he presented mitigating evidence during the guilt phase. Hence, no *Ashworth* inquiry was required.

{¶ 73} Short's first proposition of law is overruled.

## II. Defense Attempt to Present Mitigation Solely to Trial Judge

{¶ 74} In his second proposition of law, Short contends that the trial court violated his right to present mitigating evidence by denying Short's request to present mitigating evidence to the judge alone, *after* the penalty phase.

{¶ 75} Short waived his right to present mitigating evidence in the penalty phase of trial. On May 8, 2006, the jury returned a recommendation of death and was discharged. Sentencing was scheduled for May 24, 2006. On May 23, the defense filed a motion for continuance, in part because defense counsel desired to interview "several witnesses * * * that maybe [sic] testifying on Mr. Short's behalf."

{¶ 76} In court the following day, the defense requested that the trial court hold "a sentencing hearing under [former R.C.] 2929.19(A)(1) [which addresses felony sentencing] and all that that includes." 150 Ohio Laws, Part IV, 5707, 5741.[1] Specifically, the defense wanted the opportunity to introduce evidence before the trial judge. The state opposed the request, arguing that R.C. 2929.19 did not apply to capital sentencing.

{¶ 77} The trial judge denied Short's request on authority of *State v. Roe* (1989), 41 Ohio St.3d 18, 26, 535 N.E.2d 1351. In *Roe*, the appellant argued, among other things, that the trial court had erred by refusing "to permit presentation of more mitigating evidence subsequent to the jury recommendation." Id. at 26. We rejected Roe's claim: "R.C. 2929.03(D)(1) [imposing sentence for a capital offense] provides that all mitigating evidence must be presented to the jury, if the offender was tried by a jury * * *. A defendant may not wait for an unfavorable jury recommendation before presenting all relevant evidence in mitigation of sentence." Id.

---

1. The statute, R.C. 2929.19(A)(1) was amended effective April 29, 2005. All references in this opinion to R.C. 2929.19(A)(1) are to the former version of the statute.

{¶ 78} Short argues that *Roe* was incorrectly decided on this point and asks that we reconsider it. At trial, he based his argument on R.C. 2929.19(A)(1). On appeal, he bases his argument on Crim.R. 32(A)(1) (imposition of sentence), and he further argues that the Eighth Amendment to the United States Constitution, forbidding cruel and unusual punishment, requires that a capital defendant be permitted to present mitigating evidence to the trial judge even if that evidence was withheld from the jury in the penalty phase. We consider each of these arguments in turn.

*A. Applicability of R.C. 2929.19(A)(1)*

{¶ 79} Before it was amended effective April 29, 2005, R.C. 2929.19(A)(1) provided: "The court shall hold a sentencing hearing before imposing a sentence under this chapter upon an offender who was convicted of or pleaded guilty to a felony * * *. At the hearing, the offender, the prosecuting attorney, the victim or the victim's representative in accordance with [R.C.] 2930.14 * * *, and, with the approval of the court, any other person may present information relevant to the imposition of sentence in the case. The court shall inform the offender of the verdict of the jury or finding of the court and ask the offender whether the offender has anything to say as to why sentence should not be imposed upon the offender." 150 Ohio Laws, Part IV, at 5741.

{¶ 80} Aggravated murder is a felony, R.C. 2901.02(C), and a sentence for aggravated murder with aggravating circumstances is imposed under "this chapter"—that is, R.C. Chapter 2929. R.C. 2929.03(C)(2)(a), (D), and (E) (setting forth sentences for aggravated murder with one or more aggravating-circumstance specification). Hence, Short argued at trial, capital cases fall within the literal terms of R.C. 2929.19(A)(1). Moreover, according to Short, neither R.C. 2929.19 nor 2929.03 *specifically* exempts capital cases from the scope of R.C. 2929.19(A)(1). Therefore, Short argued at trial, a capital defendant is

entitled to a hearing under R.C. 2929.19(A)(1), at which he "may present information relevant to the imposition of sentence in the case."

**{¶ 81}** Short's reading of R.C. 2929.19(A)(1) is unpersuasive. Were we to accept it, capital defendants would be entitled to *two* evidentiary hearings: one before the judge and jury (the penalty phase), and a second before the judge alone. Short fails to explain why the General Assembly would have intended to create such a system. There is no reason to believe that a system of dual evidentiary hearings would make capital sentencing more fair, reliable, or consistent.

**{¶ 82}** Moreover, had the General Assembly intended R.C. 2929.19 to apply in capital cases, we believe it would have said so expressly. The comprehensive procedural scheme set forth in R.C. 2929.03 predates the enactment of R.C. 2929.19 by 22 years.[2] Short's reading of R.C. 2929.19 would work a major change in that comprehensive scheme. The General Assembly would not have intended to make such a change in a statute dealing with noncapital sentencing procedures without clearly saying so. We therefore reject Short's contention that R.C. 2929.19(A)(1) applies to capital sentencing.

*B. Applicability of Crim.R. 32(A)(1)*

**{¶ 83}** Although Short's argument at trial focused on R.C. 2929.19(A)(1), he claims on appeal that Crim.R. 32(A)(1) also entitles a capital defendant to a sentencing hearing in front of the judge without a jury.

**{¶ 84}** We disagree. Crim.R. 32(A)(1) grants the defendant in a criminal case the right to *address* the court in allocution, either in person or through counsel. The rule permits counsel "to speak on behalf of the defendant" and entitles the defendant "to make a statement in his or her own behalf or present any information in mitigation of punishment."

---

2. R.C. 2929.19 was enacted in 1995. Am.Sub.S.B. No. 2, 146 Ohio Laws Part IV, 7136, 7485. R.C. 2929.03 became effective in 1973. Am.Sub.H.B. No. 511, 134 Ohio Laws, Part II, 1866, 1978-1979.

{¶ 85} However, the right to "present any information in mitigation" does not imply a right to an evidentiary hearing. "The purpose of allocution is to permit the defendant to speak on his own behalf or present any information in mitigation of punishment." *State v. Reynolds* (1998), 80 Ohio St.3d 670, 684, 687 N.E.2d 1358. See also *State v. Campbell* (2000), 90 Ohio St.3d 320, 325-326, 738 N.E.2d 1178 (allocution involves defendant's ability to make a personal appeal to sentencing judge). Moreover, "the plain wording of the rule does not encompass anyone other than the defendant presenting information in mitigation." *State v. Lowe* (May 3, 2001), Cuyahoga App. No. 78021, 2001 WL 468536, *2.

{¶ 86} Thus, neither R.C. 2929.19(A)(1) nor Crim.R. 32(A)(1) entitles a capital defendant to withhold mitigating evidence from the jury and then present it to the trial judge alone. Accordingly, we decline Short's invitation to overrule *Roe*.

### C. Eighth Amendment Claim

{¶ 87} Finally, Short contends that by refusing to permit him to present evidence after the penalty phase, the trial court violated his Eighth Amendment right to present evidence in mitigation. However, he cites no authority in support of this proposition.

{¶ 88} It is well established that the Eighth Amendment requires that a sentencer in a capital case "not be precluded from considering," as a mitigating factor, "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio* (1978), 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973. See also *Eddings v. Oklahoma* (1982), 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1.

{¶ 89} Unquestionably, then, Short had a right to present mitigating evidence to the trial judge. But he had his opportunity to do so in the penalty phase of his trial when, as provided by R.C. 2929.03(D)(1), he could have

presented his evidence to both the judge and jury. He declined to take that opportunity. Nothing in Eighth Amendment jurisprudence entitled him to a second opportunity to present before the judge alone mitigation that he had chosen to withhold from the jury.

{¶ 90} Short's second proposition of law is overruled.

### III. Hearing on the Defense's Pretrial Access to Witnesses

{¶ 91} At trial, the defense claimed that the Victim Witness Division of the Montgomery County prosecutor's office unconstitutionally interfered with counsel's ability to interview Short's children, all state witnesses, before trial.[3] In his third proposition of law, Short contends that the trial court erred by failing to hold a hearing to inquire into this claim.

{¶ 92} Short's three minor children testified as prosecution witnesses in the guilt phase. According to Jeffrey D. Livingston, the guardian ad litem of the Short children, Rhonda Short's mother, Macy Lane, had custody of Justin, Rhonda's sister Amy Spivey had custody of Tiffany, and Rhonda's sister Gina Gibbs had custody of Jesse. Before trial, the defense filed a motion for an order allowing defense counsel to interview the children in the presence of the guardian ad litem. The trial court did not rule immediately on this motion.

{¶ 93} During pretrial proceedings, defense attorney L. Patrick Mulligan told the court that he had been in contact with Livingston, who was working to arrange an interview. Mulligan told the court that the children's guardians were refusing to let the interviews go forward. He said his office had forwarded to him a message from Livingston to the effect that Gina Gibbs and Amy Spivey had

---

3. A criminal defendant has a right to seek pretrial interviews with witnesses without interference from the prosecution. See generally Annotation, Interference by Prosecution with Defense Interrogation of Witnesses (1979), 90 A.L.R.3d 1231, Section 2(a). On the other hand, a witness generally has no obligation to submit to a pretrial interview. *State v. Zeh* (1987), 31 Ohio St.3d 99, 31 OBR 263, 509 N.E.2d 414, paragraph one of the syllabus. Moreover, "[i]f the witness is a minor, the legal custodian has the right to refuse the interview." *State v. Brown* (1996), 112 Ohio App.3d 583, 596, 679 N.E.2d 361.

"said no" to the proposed interviews, "so there will be no meeting today. * * * Because he [Livingston] is allowing the guardians to make the call, we are not being given access to the potential witnesses."

{¶ 94} The trial court asked Mulligan whether he had any evidence that the state had interfered with defense efforts to interview the children. Mulligan admitted that he had no "direct evidence" of state interference. He added: "The only thing I know from Mr. Livingston was that Amy supposedly is going to contact Victim Witness before making a decision. I don't know if that's been done or not, and I could not seek what was sent to them by Victim Witness."

{¶ 95} The prosecutor stated: "I'm unaware [of] Victim Witness being contacted or having any contact with the – the legal [guardians] – or the Guardian Ad Litem." He added that Livingston had "contacted [them] also indicating that [at] the request of defense counsel he contacted the legal custodians to see if he could help in any way in facilitating * * * an interview or a meeting with * * * the children, but it's also our understanding that he explained to them that it was their call, it was their decision whether or not they wanted to meet with defense counsel, and apparently they've made that call."

{¶ 96} During the state's case-in-chief, Tiffany and Jesse Short testified and were cross-examined by the defense. Before Tiffany's direct testimony, the trial court denied the defense motion to interview the children because "there was no evidence that the State interfered in any manner with the Defendant's access to the minor children."

{¶ 97} After Justin Short testified on direct examination, the defense raised the access issue again. The defense asked that the trial court strike Justin's testimony, partly on the ground that the defense had "no access" to him before trial.[4] The trial court asked whether the defense had any evidence that the state

---

4. The defense also alleged discovery violations, but Short is not raising any discovery issue on appeal.

had interfered with defense access to Justin. The defense pointed out, "[W]e have not had a hearing on that," and the trial court stated: "We can still have a hearing." The defense requested "a hearing where we may voir dire Justin Short, we may question the * * * Guardian Ad Litem, and the guardian of Justin Short, and possibly the people from Victim Witness."

{¶ 98} The trial court again asked whether the defense had any "good faith evidence or basis to suggest that the State in any manner has interfered with the Defendant's access to the witnesses." Counsel replied, "At the moment, Your Honor, no, we don't. That's why we're asking for a hearing on this stuff. * * * [W]e would have to pull people in here from the State and * * * Justin himself to show that." The court asked: "Were you denied access by the State?" Defense counsel replied: "Your Honor, how would I know? I don't know." However, counsel admitted that they had not tried to contact the children's legal guardians directly.

{¶ 99} Initially, the trial court denied the request for a hearing. However, defense counsel then stated: "It's my understanding that the contact with the Victim Witness [sic] and they indicated that they wouldn't agree. * * * We believe that Victim Witness would if asked * * * say that, that's correct." The trial court stated: "I've not heard before that Victim Witness told somebody not to testify." Defense counsel stated: "I don't know whether that's a true statement. * * * What Mr. Livingston said was there was a conversation. The content of that conversation I was not privy to." The trial court decided to call Livingston to testify.

{¶ 100} Livingston testified that "a couple weeks ago," Mulligan had called him to set up an interview with the children. Livingston agreed that any such interview could be held at his office, and a tentative date was scheduled. Livingston then phoned the three legal guardians. According to Livingston, Lane indicated that she wanted to consult Spivey. Livingston left a message for Gibbs,

but he did not testify on whether he had ever reached her. He testified that he spoke to Spivey, but he did not testify to what she said. The meeting between the children and defense counsel did not take place.

{¶ 101} Livingston testified that he did not know of any conversations or contacts between any of the legal guardians and the Victim Witness Division. He also testified that the guardians had never stated to him that they had contacted the Victim Witness Division. Defense attorney Mulligan asked whether Livingston recalled telling Mulligan that the custodians "were going to contact Victim Witness," but Livingston did not recall making such a statement.

{¶ 102} After Livingston's testimony, attorney Mulligan made the following proffer: "[B]asically Mr. Livingston and I were trying to set up this meeting as he described. The meeting did not happen.

{¶ 103} "It's my understanding that one — and I don't know which one exactly to be quite frank about it, Your Honor.

{¶ 104} "One of the legal custodians called Victim Witness and I don't know the content of that conversation. The meeting did not happen.

{¶ 105} "* * * [W]e assume that * * * the kibosh was put on it at that time. That's an assumption because I don't know the content of the conversation."

{¶ 106} The prosecutor asked Mulligan for the source of his assertion that one of the legal custodians had called Victim Witness. Mulligan stated that this information came from Livingston. The trial court asked defense counsel whether they had anything further to present, and counsel said, "No."

{¶ 107} The trial court denied the defense request for further hearing, finding "no evidence that the State in any manner has interfered with the Defendant's access to the witnesses." She added, "[A]s I previously indicated, the Defendant and his counsel were free to communicate with the custodians themselves." Short now contends that the trial court's "fail[ure] * * * to hold a

hearing with the guardians and the Victim Witness personnel involved" denied him due process. This claim lacks merit.

{¶ 108} To begin with, Short cites no authority for the proposition that a defendant is entitled to a hearing on an allegation of prosecutorial interference when he is unable to state any facts in support of that allegation. When Short's counsel requested the hearing, they admitted that they had no evidence of interference and did not know whether any interference had actually taken place. The defense repeatedly admitted that it did not know what, if anything, the Victim Witness Division had told the legal guardians. The defense also conceded that they had not asked the guardians about any contact they might have had with the Victim Witness Division.

{¶ 109} Nevertheless, the trial court did grant the defense a hearing into its allegation of interference. Short complains that the scope of the hearing was insufficient in that the custodians of the children and certain unidentified Victim Witness personnel did not testify. We disagree. The trial court imposed no limits on the hearing's scope. On the contrary, after Mulligan made his proffer, the court specifically asked whether the defense had anything further, and defense counsel said, "No."

{¶ 110} The defense did not attempt to call either the guardians or any personnel from the Victim Witness Division to testify at the hearing. Victim Witness personnel, at least, could easily have been called, for the record indicates that Victim Witness personnel were present in court just before the hearing began. According to the transcript, the trial court asked the "people from Victim Witness in the back to step out" before discussing the defense claims of interference. Nothing in the record suggests that the trial judge would have refused to hear such witnesses had the defense chosen to call them.

{¶ 111} Nor did Short's counsel ask the trial court to allow them to interview Justin before cross-examining him. Had they requested such an

24

opportunity, they might have been able to interview Justin there and then. (Alternatively, if Justin or his guardian had refused an interview, Short's counsel could have asked them, on the record, whether the Victim Witness Division had influenced that decision.) Counsel's failure to seek this remedy suggests that the defense was not prejudiced by its inability to interview Justin before trial.

{¶ 112} Short's third proposition of law is overruled.

### IV. Ineffective Assistance of Counsel

{¶ 113} In his fourth proposition of law, Short claims that his trial counsel rendered ineffective assistance. To establish ineffective assistance, he must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different. *Strickland v. Washington* (1984), 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. Short's individual allegations of ineffective assistance are set forth in parts B through F of his fourth proposition.

{¶ 114} In part B, he contends that his counsel failed him "by not properly pursuing the issue of contact with his children." As we discussed above, Short's counsel tried to schedule defense interviews with the children through the guardian ad litem, Jeffrey Livingston. After the children's custodians refused to allow the requested interviews, defense counsel filed a motion asking the trial court to order the interviews. After that motion was denied, defense counsel orally moved to strike Justin's testimony on the ground that the Victim Witness Division of the prosecutor's office had somehow been involved in the decisions of the guardians.

{¶ 115} When the trial court held a hearing on the motion to strike, only the guardian ad litem was called as a witness. Short points out that his trial counsel made no attempt to call any witness from the Victim Witness Division to

support the defense claim of interference. Counsel's failure to call such witnesses appears to be the gravamen of his ineffective-assistance claim (although Short's brief is unclear on this point).

{¶ 116} However, Short's claim is speculative. He does not identify any particular person or persons from the Victim Witness Division who should have been called to testify. Thus, he fails to identify deficient performance on the part of his counsel.

{¶ 117} Short also fails to show prejudice. The record does not show what those witnesses would have testified to, even if his counsel had called them. Short's counsel believed that there had been some contact between a Victim Witness representative and the guardians before the guardians refused to permit defense interviews. But counsel conceded that they did not know what the content of any such conversations may have been.

{¶ 118} Indeed, there is no evidence in the record that any such conversations took place. At most, defense attorney Mulligan stated that Livingston had told him that one of the guardians had called the Victim Witness Division. Even this claim was implicitly contradicted by Livingston, who testified that none of the custodians had ever told him that they had contacted the Victim Witness Division, that he did not know whether any such contact occurred, and that he did not recall having told attorney Mulligan that the custodians "were going to contact Victim Witness."

{¶ 119} Short's claim with respect to both performance and prejudice rests on mere speculation. "Such speculation is insufficient to establish ineffective assistance." *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 217, citing *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 219, and *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 121.

{¶ 120} In part C of his fourth proposition, Short contends that his counsel failed to make sufficient efforts to introduce evidence that on the day after Rhonda left him, he was suicidally despondent. During the guilt-phase cross-examination of Justin Short, the defense elicited testimony that one night after Rhonda left Short, police had come to Short's house, had confiscated his shotgun, and had taken him to a hospital.

{¶ 121} During Short's guilt-phase case-in-chief, the defense called Mike Rosenbalm, a Monroe, Ohio, police officer. Rosenbalm testified that on July 16, 2004, he had been dispatched to Short's home and that Short had been crying and was highly emotional. Rosenbalm remained at Short's house for over an hour. However, the state objected to anticipated testimony that Short was suicidal, that Rosenbalm had taken him to a hospital for psychiatric testing and had confiscated his gun, arguing that Rosenbalm could not testify about Short's mental state. The state's objections to the testimony were sustained. The defense did not call Rosenbalm as a witness in the penalty phase.

{¶ 122} Although Short does not challenge the exclusion of Rosenbalm's testimony from the guilt phase, he contends that his attorneys should have called Rosenbalm as a mitigation witness in the penalty phase. According to Short, Rosenbalm's testimony would have had mitigating value, because it showed the depth of Short's emotional distress at Rhonda's leaving.

{¶ 123} However, Short's claims fail to demonstrate prejudice. First, evidence that Short was suicidal on July 16 would have had little relevance or mitigating value relative to murders that he committed on July 22, nearly a week later. Second, there was already considerable evidence in the guilt-phase record to show that Short was deeply upset after Rhonda left.

{¶ 124} Justin testified that his father was "[u]pset and maybe angry" and "pretty sad" after reading Rhonda's note announcing her departure. Officer Rosenbalm testified that Short was "very emotional [and] crying" on July 16.

Justin was permitted to testify that the police had confiscated Short's gun one night and that Short "went to a hospital" that same night. Short's work supervisor, Robert Thomas, testified that on the Monday or Tuesday before the murders (i.e., July 19 or 20), Short was "tearful" and appeared "run down." Short told Thomas he "just wanted to die" because Rhonda had left him. He could talk of nothing else and was unable to work.

{¶ 125} Short's cousin Loren Taylor testified that on the night of July 21, at the Abundant Life Tabernacle, Short made a fist and in a tense, aggravated tone of voice, spoke of killing. Taylor's testimony also indicated that Short had not been feeding Justin: "[H]e said, is there any food here because we haven't aten [sic] in awhile. My son hasn't ate in awhile."

{¶ 126} Though not a member of Taylor's church, Short not only attended that evening's service but went up to the altar to pray. In fact, Justin testified that Short sought religious consolation during the week by attending services at four churches other than his own and that the congregation at each one offered special prayers for him.

{¶ 127} On the night of July 22, while trying to buy a gun from Brandon Fletcher, Short struck the wall and said, "I don't know what I've done to her to deserve this." Fletcher testified that Short's emotional state was such that Fletcher had thought it unwise to sell him a gun.

{¶ 128} Given the extensive evidence of Short's emotional distress, evidence that Short was suicidal on July 16 would have added little to the defense's mitigation case. Thus, it cannot be said that defense counsel's failure to call Rosenbalm created a reasonable probability that the result of the penalty phase would have been otherwise.

{¶ 129} In part D of his fourth proposition, Short contends that his counsel failed to investigate mitigation and therefore could not make an informed strategic judgment on whether to present mitigating evidence to the jury. Short's

contention fails because "the record does not show the extent of counsel's investigation." *Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 224. In fact, defense counsel advised the trial court that they had "made a thorough investigation of mitigating evidence * * * including inquiries of family members and other persons."

{¶ 130} The record does show that counsel declined to engage a court-appointed mitigation specialist to help investigate mitigating factors. However, Short fails to demonstrate prejudice resulting from this decision. Nothing in the record indicates what a mitigation specialist could have discovered. Thus, Short's ineffective-assistance claim is speculative.

{¶ 131} In part E of his fourth proposition, Short contends that the trial court failed to define the term "mitigating factors" for the prospective jurors during the voir dire and that defense counsel should have objected to this omission. However, Short cites no authority for the proposition that the trial court was obliged to define "mitigating factors" during voir dire. Thus, he fails to show that defense counsel erred by not objecting. Short also fails to demonstrate prejudice. He offers no explanation of why or how the result of the proceeding would have been different had the trial court defined "mitigating factors" during voir dire.

{¶ 132} Finally, in part F of his fourth proposition of law, Short contends that trial counsel should have raised constitutional and international-law objections to Ohio's death-penalty statutes. These objections are weak and have been consistently rejected. (See "Settled Issues," below.) Short's counsel did not perform deficiently by declining to raise claims with no chance of success. In *State v. Davis* (1991), 62 Ohio St.3d 326, 349, 581 N.E.2d 1362, we held that trial counsel's failure to file a pretrial motion challenging the constitutionality of Ohio's death-penalty statute did not constitute ineffective assistance of counsel.

{¶ 133} Short's fourth proposition is overruled.

## V. Nature and Circumstances of Offense

**{¶ 134}** Short filed a motion in limine to prohibit the prosecution from asking the jury to consider the nature and circumstances of the offense during the mitigation phase of the trial. In his fifth proposition, he contends that the trial court erred by overruling this motion.

**{¶ 135}** This proposition of law lacks merit. In the first place, Short fails to identify any improper prosecutorial references to the nature and circumstances of the offense. Even if he were able to do so, his motion in limine, by itself, was insufficient to preserve any issue. See *State v. Maurer* (1984), 15 Ohio St.3d 239, 259, 15 OBR 379, 473 N.E.2d 768. Short's fifth proposition is therefore overruled.

## VI. Settled Issues

**{¶ 136}** In his sixth through 13th propositions, Short attacks the constitutionality of Ohio's death-penalty statutes. His claims are summarily overruled. See generally *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus; *State v. Spisak* (1988), 36 Ohio St.3d 80, 82, 521 N.E.2d 800.

**{¶ 137}** Short's sixth proposition contends that the death penalty violates various aspects of international law. He contends that Ohio imposes the death penalty in a racially discriminatory manner and thereby violates the Convention on Racial Discrimination. However, Short fails to cite any precedent supporting this claim. We have rejected claims that Ohio applies the death penalty in a racially discriminatory manner. See *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 103 (Ohio's statutory scheme is not racially discriminatory), citing *State v. Steffen* (1987), 31 Ohio St.3d 111, 124-125, 31 OBR 273, 509 N.E.2d 383; and *State v. Zuern* (1987), 32 Ohio St.3d 56, 64-66, 512 N.E.2d 585, discussing *McCleskey v. Kemp* (1987), 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262. Hence, we have already rejected the premise of Short's international-law argument.

**{¶ 138}** Short's other international-law claims have all been rejected by this court and/or other courts. See *State v. Phillips* (1995), 74 Ohio St.3d 72, 101, 103-104, 656 N.E.2d 643; *Buell v. Mitchell* (C.A.6, 2001), 274 F.3d 337, 370-372 (death penalty does not violate International Covenant on Civil and Political Rights ("ICCPR") or the "customary international law norm"); *People v. Perry* (2006), 38 Cal.4th 302, 322, 42 Cal.Rptr.3d 30, 132 P.3d 235 (death penalty does not violate ICCPR); *Sorto v. State* (Tex.Crim.App.2005), 173 S.W.3d 469, 490 (death penalty does not violate United Nations Convention against Torture).

**{¶ 139}** In his seventh proposition, Short contends that Ohio's death penalty scheme is arbitrary and thus violates the Eighth and Fourteenth Amendments. He further claims that it is administered in a racially discriminatory manner and thus violates the Fourteenth Amendment. We have rejected both arguments. See *State v. Jenkins* (1984), 15 Ohio St.3d 164, 168-169, 15 OBR 311, 473 N.E.2d 264; *Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064; *Steffen*, 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383; *Zuern*, 32 Ohio St.3d 56, 512 N.E.2d 585.

**{¶ 140}** Likewise, we summarily reject the claims pressed in Short's eighth through 13th propositions, which assert that Ohio's death-penalty statutory scheme is unconstitutional for various reasons. Short's eighth proposition is rejected on the authority of *Jenkins* at 172-173; *State v. Stumpf* (1987), 32 Ohio St.3d 95, 104, 512 N.E.2d 598. His ninth proposition is overruled on the authority of *State v. Henderson* (1988), 39 Ohio St.3d 24, 28-29, 528 N.E.2d 1237, and *Jenkins* at 178-179. His tenth proposition is overruled on the authority of *State v. Buell* (1986), 22 Ohio St.3d 124, 138, 22 OBR 203, 489 N.E.2d 795, citing *State v. Nabozny* (1978), 54 Ohio St.2d 195, 8 O.O.3d 181, 375 N.E.2d 784, paragraph one of the syllabus, overruled on other grounds in *Nabozny v. Ohio* (1978), 439 U.S. 811, 99 S.Ct. 70, 58 L.Ed.2d 103. His 11th proposition is overruled on the authority of *Henderson* at 28-29, following *Lowenfield v. Phelps* (1988), 484 U.S.

231, 108 S.Ct. 546, 98 L.Ed.2d 568. His 12th proposition is overruled on the authority of *State v. McNeill* (1998), 83 Ohio St.3d 438, 453, 700 N.E.2d 596, citing *Tuilaepa v. California* (1994), 512 U.S. 967, 973-980, 114 S.Ct. 2630, 129 L.Ed.2d 750. His 13th proposition is overruled on the authority of *Steffen*, 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus; see also *State v. LaMar,* 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 23.

## VII. Independent Sentence Review

{¶ 141} In his 14th proposition of law, Short contends that the aggravating circumstances in his case do not outweigh the mitigating factors beyond a reasonable doubt. This claim invokes our duty of independent review under R.C. 2929.05. Under that statute, this court must independently review Short's death sentence to determine whether the evidence supports the jury's finding of aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors, and whether the death sentence is proportionate to those affirmed in similar cases. R.C. 2929.05(A).

{¶ 142} With respect to each murder, Short was convicted of two aggravating circumstances: multiple murder, R.C. 2929.04(A)(5), and felony-murder, R.C. 2929.04(A)(7).

{¶ 143} *Multiple murder*: Short was convicted under the course-of-conduct provision of R.C. 2929.04(A)(5): "[T]he offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender." The evidence supports Short's convictions of this aggravating circumstance. First the evidence establishes that both killings were purposeful. Three times during the two months preceding the killings, witnesses heard Short say he would shoot or kill Rhonda if she ever left him. On one of those occasions, Short said that if Rhonda left him for another man, he would "shoot both of 'em." After Rhonda left him, Short told Loren Taylor that she had left him for "another man" and that he had "just thought about going over there

and killing him." On the night of the murders, Short drove to the Dayton Mall to buy a gun after trying to buy one from his neighbor. When Justin begged him not to shoot anyone, Short replied, "[N]o — I have to do this." After shooting Sweeney, Short pursued Rhonda to the bathroom, kicked in the locked door, and shot her. Short shot both victims in the chest, a vital area.

{¶ 144} Second, the evidence establishes that both murders were part of a single course of conduct. "In order to find that two offenses constitute a single course of conduct under R.C. 2929.04(A)(5), the trier of fact 'must * * * discern some connection, common scheme, or some pattern or psychological thread that ties [the offenses] together.' " *State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008 822 N.E.2d 1239, syllabus, quoting *State v. Cummings* (1992), 332 N.C. 487, 510, 422 S.E.2d 692. Specific examples of "factual link[s]" that may establish a course of conduct include "time, location, murder weapon, or cause of death" and "a similar motivation on the killer's part for his crimes." *Sapp* at ¶ 52.

{¶ 145} In this case, the two victims were killed within minutes of each other, at the same address, with the same weapon, and for the same reason. Thus, the evidence supports the jury's finding that they were part of a single course of conduct for purposes of R.C. 2929.04(A)(5).

{¶ 146} *Felony murder*: Under R.C. 2929.04(A)(7), Short was convicted of committing the murders as the principal offender while committing, attempting to commit, or fleeing immediately after committing or attempting to commit aggravated burglary.

{¶ 147} The evidence supports this specification. Aggravated burglary under R.C. 2911.11(A)(2), as charged in the indictment, consists of trespassing by force, stealth, or deception in an occupied structure (defined in R.C. 2929.01(C)), with purpose to commit a criminal offense, while possessing a "deadly weapon or dangerous ordnance" (defined in R.C. 2923.11(A) and (K)), when another person (other than an accomplice) is present therein.

{¶ 148} When Short entered the back door of 5035 Pepper Drive, he trespassed. The circumstances of Rhonda's occupancy – she had fled the family home at a time of marital disharmony without leaving a forwarding address and had contracted for utility service under her maiden name – permit the inference that Short lacked permission to be there. Short trespassed by force, as shown by Tiffany's testimony that he shoved the door open forcefully: "When he came in me and Jesse kinda went back, like when he came in it was hard enough for us to go back * * *."

{¶ 149} The evidence showed that the house was an "occupied structure" as defined in R.C. 2909.01(C). It was undisputed that Rhonda, Tiffany, and Jesse, who were not Short's accomplices, were present when Short forced his way in. Finally, Short's sawed-off shotgun was a "deadly weapon" as R.C. 2923.11(A) defines that term: "[A]ny instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon."

{¶ 150} Short did not introduce any evidence in the penalty phase, nor did he make an unsworn statement to the jury, choosing instead to rely solely on guilt-phase evidence. He did make a statement in allocution to the trial court, however. In allocution, Short stated that he accepted "full responsibility" for the murders and that he blamed no one else. However, he also said, "[O]ther people played crucial parts in what led up to my actions * * *." Specifically, he blamed Donnie Sweeney for being "involved" with Rhonda, and Sweeney's mother, Brenda Barian, for "playing Cupid" for Sweeney and Rhonda.

{¶ 151} Short contended that he committed the offenses while in the grip of strong emotions caused by Rhonda's leaving him. Short explained that on the night Officer Rosenbalm came to his house, he had been "pacing back and forth with a loaded shotgun contemplating suicide." He eventually surrendered the gun and was taken to Middletown Regional Hospital for observation and evaluation,

but was released within hours. Although he had been given nerve and sleep medication, he found that they did not help.

{¶ 152} Short also said that one night after Rhonda left, he answered the telephone: "[A]ll I heard on the line was sorrowful country music like, your baby's gone and the reason I must go. Someone apparently thinking my pain and mental anguish were amusing. This occurred sporadically throughout that evening."

{¶ 153} Short claimed that he still loved Rhonda and denied that Rhonda had been afraid of him. He claimed that during the week he was looking for Rhonda, "all [he] wanted to do was to talk to" her. In fact, Short claimed that even on the night of the murders, he wanted only to talk to Rhonda.

{¶ 154} Short gave his own account of what he was thinking on the night of the murders. He said that he had a gun only because he feared a confrontation with Sweeney. Had Sweeney not been at the house, Short claimed, he would have left the gun in the truck. He claimed that he waited across the street "not for reconnaissance purposes." He "was waiting and hoping for Mr. Sweeney * * * to leave." Finally, when he "couldn't take the mental pressure and emotional torture any longer," he went to the back yard, but only so he could look through a window and see what Rhonda and Sweeney were doing.

{¶ 155} Short claimed that when he encountered Sweeney on the back patio, he said, "[H]ey, what are you doing here with my wife?" Short said that Sweeney was shot during a struggle for the gun. Short said he then "went into a fit of rage and passion, and that's when [his] wife was shot." He "kicked in the bathroom door."

{¶ 156} Short stated that he had reloaded the gun and was about to kill himself when he saw the dying Rhonda walk into the kitchen. He put her into a chair and told her to "hang on" while he went for help. According to Short, he drove to the corner UDF and asked someone to call 9-1-1 for help at 5035 Pepper

Drive. Then he returned to the house and waited for the police. Short concluded by apologizing to Sweeney's family, Rhonda's family, his own family, and his children.

{¶ 157} Short's principal claim in mitigation was that he suffered emotional distress because Rhonda left him. There is some evidence in the record to support this contention. However, under the circumstances of this case, this factor deserves no weight. Short committed the murders an entire week after Rhonda left him. The evidence at trial shows that the murders were thoroughly planned and elaborately prepared. Short discovered Rhonda's new address from the power company by deception. He then drove to Huber Heights to locate the address. According to the realtor in Huber Heights, Short's demeanor was calm at that time.

{¶ 158} Short used his employer's truck and wore a hat so that Rhonda would not recognize him. He tried to buy a shotgun from his neighbor; when he failed, he bought one at a store, filling out the required forms and showing identification. He went to a different store and bought a hacksaw, then checked into a hotel for privacy while he sawed off the barrel and tried to saw off the stock. Each step in this lengthy process required consideration and gave Short an opportunity to bring his emotions under control. Yet when Justin asked him not to kill anyone, Short insisted, "I have to do this." Justin was with Short continuously during the hours leading up to the murders, and nothing in his testimony indicates that Short displayed any strong emotion during that time.

{¶ 159} Thus, while the record suggests that Short did feel strong emotional distress over Rhonda's leaving, it fails to indicate that Short was in the grip of uncontrollable emotion when he committed the murders. Thus, we find that this mitigating factor should receive no weight. See *State v. Turner*, 105 Ohio St.3d 331, 2005-Ohio-1938, 826 N.E.2d 266, ¶ 95.

**{¶ 160}** In addition to Short's emotional state, other mitigating factors exist. The record shows that Short was employed and supported his family. Short also submitted to arrest without resistance and cooperated with the police. R.C.2929.04(B)(7).

**{¶ 161}** In its sentencing opinion, the trial court noted that it had considered psychiatric reports that had been prepared before trial with regard to Short's competence. The reports indicated that Short had sustained a head injury in 1997, had developed a dependency on prescription drugs as a result, and had a history of drug and alcohol abuse. Although he had some "social adjustment issues," and his mother was "very strict," Short reported no abuse.

**{¶ 162}** There is nothing mitigating in the nature and circumstances of the offenses. Moreover, we find little that is mitigating in Short's allocution. While purporting to accept "full responsibility" for the murders, Short's allocution actually blames them on Sweeney and Barian. Short also gives an implausible account of the murders, in which Sweeney was killed in a struggle over the gun and Rhonda was then killed "in a fit of rage or passion." This claim cannot be reconciled with Tiffany's testimony.

**{¶ 163}** We must weigh two aggravating circumstances—multiple murder, R.C. 2929.04(A)(5), and felony murder predicated on aggravated burglary, R.C. 2929.04(A)(7)—against the weak mitigation. Short asserts that the multiple-murder aggravating circumstance deserves only a "comparatively light" weight. He does not explain why this should be so, however. To the contrary, we found in a case that involved one murder and one attempted murder, that the multiple murder specification carried "great weight in aggravation." *State v. Hutton*, 100 Ohio St.3d 176, 2003-Ohio-5607, 797 N.E.2d 948, ¶ 91. Here, Duane Short killed two persons, Rhonda Short and Donnie Sweeney, in the process of committing aggravated burglary. In this case, we find that the

aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

**{¶ 164}** Finally, Short's death sentence is proportionate to sentences approved in similar cases. We have affirmed death sentences in other cases conjoining the murder of two victims with felony murder. See *State v. Hughbanks*, 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, ¶ 144 (burglary and double murder); *State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064, ¶ 112 (robbery and double murder). Indeed, we have approved death sentences for double murder or burglary-murder standing alone. See *Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 162 (double murder); *State v. Awkal* (1996), 76 Ohio St.3d 324, 339-340, 667 N.E.2d 960 (same); *State v. Combs* (1991), 62 Ohio St.3d 278, 294, 581 N.E.2d 1071 (same); *State v. O'Neal* (2000), 87 Ohio St.3d 402, 421, 721 N.E.2d 73 (defendant murdered estranged wife during aggravated burglary).[5]

**{¶ 165}** For the foregoing reasons, we affirm Short's judgments of conviction and sentence of death.

Judgment affirmed.

O'CONNOR, C.J., and PFEIFER, LUNDBERG STRATTON, O'DONNELL, CUPP, and MCGEE BROWN, JJ., concur.

_____

Mathias J. Heck Jr., Montgomery County Prosecuting Attorney, and Carley J. Ingram, Robert C. Deschler, and Leon J. Daidone, Assistant Prosecuting Attorneys, for appellee.

Gary W. Crim; and Altick & Corwin., L.P.A., and Dennis J. Adkins, for appellant.

_____

---

5. The state's brief incorrectly cites *State v. Turner*, 105 Ohio St.3d 331, 2005-Ohio-1938, 826 N.E.2d 266, as a case involving murder during an aggravated burglary.