[Cite as *State v. Redic*, 2019-Ohio-3395.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## GREENE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2019-CA-1 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-320 |
| | : | |
| JERAD D. REDIC | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 23rd day of August, 2019.

. . . . . . . . . . .

DAVID M. MORRISON, Atty. Reg. No. 0087487, Assistant Prosecuting Attorney, Greene County Prosecutor's Office, 61 Greene Street, Suite 200, Xenia, Ohio 45385
    Attorney for Plaintiff-Appellee

HILARY LERMAN, Atty. Reg. No. 0029975, 249 Wyoming Street, Dayton, Ohio 45409
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Defendant-appellant Jerad D. Redic appeals his conviction for one count of rape, in violation of R.C. 2907.02(A)(2), a felony of the first degree. Redic filed a timely notice of appeal with this Court on January 4, 2019.

{¶ 2} The record establishes that Redic and the victim, Y.M., began dating in October 2017. In May 2018, Redic was living with Y.M. at her residence in Fairborn, Ohio. The incident which formed the basis of Redic's conviction occurred on the night of May 3-4, 2018. Y.M. testified that she and Redic had been arguing intermittently throughout that day and into the evening. At some point, Y.M. began driving Redic in her vehicle to a musical performance in Cincinnati, Ohio. During the drive, Y.M. and Redic continued to argue, and she eventually turned her vehicle around and drove back to her residence.

{¶ 3} Upon arriving back in Fairborn sometime after 10:00 p.m., Redic exited the vehicle and entered Y.M.'s residence. Y.M. testified that she remained outside seated in the vehicle for approximately ten to fifteen minutes. Y.M. testified that while she sat in her vehicle, she observed Redic walking back and forth through the house. Y.M. further testified that she could feel a "negative energy" coming from Redic as she observed him pacing in the house. Eventually, Y.M. exited her vehicle and entered her residence. Y.M. testified that as soon as she entered the house, Redic locked the door.

{¶ 4} Y.M. testified that, at this point, Redic began throwing things and kicking her belongings around the inside of the residence. Y.M. testified that Redic then grabbed her by her hair and neck, slammed her down on the floor, and dragged her to a nearby couch, where he choked her until she briefly lost consciousness. Y.M. testified that while

he was choking her, Redic stated the she "had killed his baby" and that she had a "smart mouth" that was "going to get her killed."

{¶ 5} Redic then stood up and ordered Y.M. to remain on the couch. Y.M. testified that she asked Redic to get her some water, but he told her to be quiet or he would hit her in the face. Y.M. also testified that Redic said that she was going to "die that night." Y.M. testified that she remained lying on the couch for approximately 15 minutes because she was scared to move. Eventually, Redic came and sat down beside Y.M. on the couch and told her that she had to do what he told her to do. Y.M. testified that Redic told her that she was his "hostage." Redic also said that he would steal Y.M.'s social security money, that he wanted to kill himself, and that he wanted to kill her.

{¶ 6} Y.M. testified that at this point, Redic removed his clothes, pulled Y.M. off of the couch, and pulled down her pants. Y.M. testified that Redic first inserted his fingers into her vagina, but stopped after she informed him that she was menstruating and was using a tampon. Thereafter, Redic turned Y.M. around, forced her onto the sofa, spit between her buttocks, and "very, very forcefully" inserted his penis into her anus. Y.M. testified that although the two had engaged in consensual sex in the past, the sexual acts which occurred between her and Redic on May 3 and 4, 2018, were not consensual.

{¶ 7} After the incident concluded, Y.M. and Redic went into the bathroom, after which Redic took Y.M.'s cellphone and car keys and walked back into the living room. Y.M. testified that she told Redic that she was in fear for her life and asked him if she could use her cellphone to call her nephew. Redic gave Y.M. her cellphone back, and Y.M. testified that she simultaneously received a call from her sister. Y.M. testified that she told her sister to call back later. After Y.M. ended the call, however, she sent her

sister a text message directing her to call the police. Y.M. also provided her address and Redic's identifying information in the text message to her sister. Y.M. testified that she did not mention that she had been raped in the text because she only wanted to include pertinent information that would induce her sister to contact the police. Y.M. testified that she could not call police herself because Redic was watching her, and she was scared of how he would react. After Y.M. sent the text to her sister, Redic took her cellphone away from her. Y.M. testified that Redic fell asleep on the couch shortly thereafter, and she was able to regain possession of her cellphone.

{¶ 8} Y.M. testified that she later asked Redic if she could go outside and roll up her vehicle's windows in case it started raining. Redic kept her car keys but allowed Y.M. to go outside under the pretense of rolling up her windows. Once outside, Y.M. called 911 and spoke to a dispatcher, explaining that she had been strangled, assaulted, and held hostage in her own residence. Y.M. testified that the police officers arrived before she had an opportunity to inform the dispatcher that she had been raped.

{¶ 9} Fairborn Police Officer Joshua Lightner testified that he and Officer Sopher were the officers who responded to Y.M.'s residence. Officer Lightner testified that when they arrived, Y.M. was standing in front of her residence waving them down. Officer Lightner testified that Y.M. had visible injuries to her neck and was crying. Officer Lightner further testified that he left Y.M. with Officer Sopher, while he (Lightner) went inside the residence in order to locate Redic. We note that Officer Sopher did not testify at trial.

{¶ 10} Officer Lightner testified that, after entering the residence, he found Redic sleeping on the couch. Officer Lightner testified that Redic stated that he and Y.M. had

argued that night, but he denied that any type of physical altercation had occurred. When Officer Lightner asked him how the argument ended, Redic stated that he "just stopped talking to her and went to bed." Officer Lightner testified that Redic claimed to know nothing about the injuries to Y.M.'s neck. After further questioning from Officer Lightner, Redic admitted that after they argued, he and Y.M. had "wrestled around." Redic then informed Officer Lightner that he and Y.M. had sex, and then he went to bed. At this point, Officer Sopher called Officer Lightner back outside after Y.M. disclosed that she had been raped. Officer Lightner testified that Redic's hands were bleeding and he had blood on his shirt. Thereafter, Redic was arrested and taken into custody while Y.M. was taken to the hospital where a rape kit was performed and she was treated for her injuries.

{¶ 11} On May 11, 2018, Redic was indicted for two counts of rape, in violation of R.C. 2907.02(A)(2), both felonies of the first degree (Counts I and II); one count of attempted felonious assault, in violation of R.C. 2923.02(A) and 2903.11(A)(1) (Count III); and one count of abduction, in violation of R.C. 2905.02(A)(2), a felony of the third degree (Count IV). At his arraignment on May 18, 2018, Redic stood mute, and the trial court entered a plea of not guilty to the charged offenses.

{¶ 12} On June 12, 2018, the State filed a bill of particulars which described the offenses as follows: Count I, rape, alleged forceful digital penetration of the vagina; Count II, rape, alleged forceful penile penetration of the anus; Count III, attempted felonious assault, alleged strangulation to the point of unconsciousness or near unconsciousness; and Count IV, abduction, alleged that Redic restrained the liberty of Y.M. by force and threat of force by locking the door to the residence, threatening physical harm, and

physically and sexually assaulting Y.M.

{¶ 13} The case proceeded to jury trial on November 5, 2018, after which Redic was found guilty for Count II. Redic was acquitted on the remaining counts. At disposition on December 14, 2018, the trial court sentenced Redic to a mandatory prison term of seven years for Count II.[1] Redic was also designated a Tier III sex offender.

{¶ 14} It is from this judgment that Redic now appeals.

{¶ 15} Redic's sole assignment of error is as follows:

THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 16} In his assignment of error, Redic contends that the jury's verdict finding him guilty of rape was against the manifest weight of the evidence. Specifically, Redic argues that because Y.M.'s medical history indicated a past history of schizoaffective disorder, the jury lost its way in finding her testimony credible when she said that she did not consent to anal intercourse with Redic. Redic also argues that additional evidence was adduced at trial which clearly established that Y.M. was not telling the truth when she claimed that she did not consent to anal intercourse with him.

{¶ 17} "The manifest-weight-of-the-evidence standard of appellate review set forth in *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), applies in both criminal and civil cases. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 17-23." *Mathews v. Mathews*, 2d Dist. Clark No. 2012-CA-79, 2013-Ohio-2471,

---

[1] The trial court's initial judgment entry of conviction erroneously stated that Redic had been sentenced to a *non-mandatory* prison term of seven years. On January 25, 2019, the trial court issued an amended judgment entry which correctly stated that Redic's seven-year sentence was *mandatory*.

¶ 9.

{¶ 18} This court has stated that "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citations omitted). *State v. Jones*, 2d Dist. Montgomery No. 25724, 2014-Ohio-2309, ¶ 8. "When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.*, quoting *Thompkins* at 387.

{¶ 19} Because the trier of fact sees and hears the witnesses at trial, we must extend deference to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). However, we extend less deference in weighing competing inferences suggested by the evidence. *Id.* The fact that the evidence is subject to differing interpretations does not render the judgment against the manifest weight of the evidence. *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 14. A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 20} At trial, Y.M. testified to past instances of drinking alcohol and smoking marijuana, but she testified consistently throughout the trial that she was sober on the night of the incident. Y.M. also testified that she did not have any concerns regarding

her mental health, though she admitted to being diagnosed as a child with bipolar disorder, post-traumatic stress disorder (PTSD), and anxiety. Although the records were never admitted into evidence, Redic was permitted to question Y.M. regarding old medical records from Eastway Behavioral Health which indicated that Y.M. had in fact been diagnosed with bipolar disorder, schizophrenia, and PTSD. Redic also presented medical records from a hospital visit in August 2018, which indicated that Y.M. had been diagnosed with schizoaffective disorder.

{¶ 21} Y.M., however, testified that she had never suffered from hallucinations, and did not take any medications to treat her diagnoses. Y.M. also testified that she was never informed that she had been diagnosed with schizophrenia and had never been treated for that condition. Nevertheless, Y.M. maintained that she was sexually assaulted by Redic and that she had not hallucinated the assault or the injuries she suffered as a result of the assault.

{¶ 22} At trial, Redic presented the testimony of Dr. Julie Walsh-Messinger, a clinical psychologist employed by the University of Dayton and an expert on schizophrenia and related disorders. Significantly, Messinger testified that she had never treated or even met Y.M. Messinger testified that schizophrenia is a chronic disorder marked by symptoms such as hallucinations, lack of affect, social withdrawal, and unclear thought processes. Messinger further testified that schizoaffective disorder includes schizophrenia coupled with episodes of depression or mania. Messinger testified that those individuals suffering from the disorder may exhibit fixed, but false, beliefs. Messinger testified that the disorder can also affect memory and may result in "circumstantial or tangential speech," which she described as becoming easily distracted

when speaking with others while constantly shifting the focus of the conversation. Nevertheless, Messinger testified that a diagnosis of schizoaffective disorder does not mean that a particular individual is incapable of accurately recalling past events and relaying them to others. Additionally, Messinger testified that memories of being physically assaulted are much less likely to be affected by schizoaffective disorder because of the manner in which the brain stores the memory.

{¶ 23} On cross-examination, Y.M. acknowledged having made a Facebook Live video on May 4, 2018 upon returning from the hospital after the incident. In the video, Y.M. stated that she was drunk at the hospital. Y.M. also stated in the video that "you can't rape the willing" and that if Redic wanted to have sex, "all he had to do was ask." The video further depicted Y.M. in possession of some type of herb that she stated was used as a "natural remedy."

{¶ 24} Despite the statements made by her in the video, Y.M. testified that she did not have any alcohol to drink that night and was not drunk at the hospital. Rather, Y.M. testified that the statements she made in the video were merely a "figure of speech." Y.M. also testified that "[she] can say anything [she] want[s] for social media." On re-direct, Y.M. testified that she was neither drunk, high, nor hallucinating on the night that the incident occurred. Y.M. testified that she did not know what "schizoaffective disorder, bipolar type" was, and she had never received any type of treatment for that disorder. With respect to her statement "you can't rape the willing," Y.M. testified that she often attempted in the past to initiate sex with Redic, but he was rarely interested. Y.M. testified that if Redic had wanted to have consensual sex, she would have agreed. When she was asked whether she consented to sex with Redic on May 3 and 4, 2018, she

testified that she did not consent.

{¶ 25} The State also presented the testimony of Kathleen Hackett, a sexual assault nurse from SANE (Sexual Assault Nurse Examiners) of Butler County, Ohio. Hackett testified that she performed a sexual assault examination of Y.M. on May 4, 2018. Hackett testified that Y.M. presented with visible injuries including swelling to her left cheek, as well as scratches and abrasions on the right side of her neck. Hackett also testified that Y.M. had a hematoma or swelling on her forehead and bruising on her right wrist. Hackett testified that Y.M. suffered an injury to her anus called an anal prolapse, which is where "[t]he folds of the anus are prolapsed outside the anus" and "that's usually seen with forceful penetration." Tr. 219. Hackett further testified that an anal prolapse has occurred "when the inner folds are pulled out of the anus * * * the sphincter muscle * * * in the case half of it was pulled out. * * * It was just solid and swollen red. * * * It's outside – outside the body – or outside where it should be." Tr. 220.

{¶ 26} With respect to Y.M.'s demeanor during the examination and interview, Hackett testified that Y.M. was able to understand the questions being asked of her, was coherent and oriented, and exhibited no indications that she was providing inaccurate information regarding the incident. Hackett also testified that Y.M. did not appear to be suffering from hallucinations. Y.M. did not inform Hackett that any vaginal penetration had occurred, but Y.M. did indicate that Redic had anally penetrated her with his penis and that he did ejaculate. Therefore, Hackett swabbed for potential semen. Y.M. stated to Hackett that Redic sustained a scratch to his right hand during the incident. Finally, Hackett testified that she observed evidence that Y.M. had been strangled, namely: hair pulling, scratch marks, and fingernail impressions on her neck. As previously stated,

Officer Lightner observed that Redic was bleeding from cuts on his hands when initial contact was made at Y.M.'s residence on the night of the incident.

**{¶ 27}** The State presented the testimony of Hallie Dreyer, a forensic scientist with the Ohio Bureau of Criminal Investigation. Dreyer conducted a DNA analysis of the swabs taken by Hackett for Y.M.'s rape kit. Dreyer testified that based upon the DNA found on the anal swabs and a swab of Y.M.'s right buttock, Redic could not be excluded as a contributor to the male DNA found on the swabs. Additionally, Dreyer testified that there was no foreign DNA from any other males on the samples taken by Hackett.

**{¶ 28}** Thus, having reviewed the record, we find no merit in Redic's manifest weight challenge. It is well settled that evaluating witness credibility is primarily for the trier of fact. *State v. Brown*, 2d Dist. Montgomery No. 27571, 2018-Ohio-3294; *see also State v. Benton*, 2d Dist. Miami No. 2010-CA-27, 2012-Ohio-4080, ¶ 7. A trier of fact does not lose its way and create a manifest miscarriage of justice if its resolution of conflicting testimony is reasonable. *Id.* Here, the jury reasonably credited the State's evidence, specifically the testimony of Y.M., which established that Redic was guilty of the offense of which he was convicted. Furthermore, the fact that the jury acquitted Redic on Counts I, III, and IV supports our conclusion that the jury was able to carefully weigh the evidence. *See State v. Embry*, 2d Dist. Montgomery No. 19096, 2002 WL 1483232, *3. Accordingly, the jury did not lose its way and create a manifest miscarriage of justice in reaching a guilty verdict for rape.

**{¶ 29}** Redic's assignment of error is overruled.

**{¶ 30}** Redic's sole assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

WELBAUM, P.J. and FROELICH, J., concur.

Copies sent to:

David M. Morrison
Hilary Lerman
Hon. James A. Brogan, Visiting Judge