[Cite as *State v. Redic*, 2022-Ohio-1694.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2021-CA-38 |
| | : | |
| v. | : | Trial Court Case No. 2018-CR-320 |
| | : | |
| JERAD REDIC | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 20th day of May, 2022.

. . . . . . . . . . .

MEGAN A. HAMMOND, Atty. Reg. No. 0097714, Assistant Prosecuting Attorney, Greene County Prosecutor's Office, Appellate Division, 61 Greene Street, Suite 200, Xenia, Ohio 45385
     Attorney for Plaintiff-Appellee

JERAD REDIC, #A749-954, London Correctional Institution, P.O. Box 69, London, Ohio 43140
     Defendant-Appellant, Pro Se

. . . . . . . . . . . . .

EPLEY, J.

**{¶ 1}** Defendant-Appellant Jerad Redic appeals pro se from a judgment of the Greene County Court of Common Pleas, which denied his "Post-Conviction Petition to Vacate or Set Aside Judgment of Conviction and Sentence." For the following reasons, the trial court's judgment will be affirmed.

### I. Facts and Procedural History

**{¶ 2}** We set forth the history of the case in *State v. Redic*, 2d Dist. Greene No. 2019-CA-1, 2019-Ohio-3395 ("*Redic I*") and repeat the pertinent parts here.

**{¶ 3}** Redic and the victim, Y.M., began dating in October 2017. In May 2018, Redic was living with Y.M. at her residence in Fairborn, Ohio. Y.M. testified that on the night of May 3-4, 2018, she and Redic had been arguing intermittently throughout that day and into the evening. At some point, Y.M. began driving Redic in her vehicle to a musical performance in Cincinnati, Ohio. After Y.M. and Redic continued to argue, she eventually turned her vehicle around and drove back to her residence.

**{¶ 4}** Upon arriving back in Fairborn sometime after 10:00 p.m., Redic exited the vehicle and entered the residence. Y.M. testified that she remained outside seated in the vehicle for approximately ten to fifteen minutes. While she sat in her vehicle, she observed Redic walking back and forth through the house. Eventually, Y.M. exited her vehicle and entered her residence. As soon as she entered the house, Redic locked the door.

**{¶ 5}** At this point, according to Y.M., Redic began throwing things and kicking her belongings around the inside of the residence. Y.M. testified that Redic then grabbed

her by her hair and neck, slammed her down on the floor, and dragged her to a nearby couch, where he choked her until she briefly lost consciousness. While he was choking her, Redic stated that she "had killed his baby" and that she had a "smart mouth" that was "going to get her killed."

{¶ 6} Redic then stood up and ordered Y.M. to remain on the couch. Y.M. remained lying on the couch for approximately 15 minutes because she was scared to move. Eventually, Redic came and sat down beside Y.M. on the couch and told her that she had to do what he told her to do. Y.M. testified that Redic told her that she was his "hostage." Redic also said that he would steal Y.M.'s Social Security money, that he wanted to kill himself, and that he wanted to kill her.

{¶ 7} At this point, Redic removed his clothes, pulled Y.M. off of the couch, and pulled down her pants. He first inserted his fingers into her vagina, but stopped after she informed him that she was menstruating and was using a tampon. Thereafter, Redic turned Y.M. around, forced her onto the sofa, spit between her buttocks, and "very, very forcefully" inserted his penis into her anus. Y.M. testified that although the two had engaged in consensual sex in the past, the sexual acts which occurred between her and Redic on May 3 and 4, 2018, were not consensual.

{¶ 8} Y.M. later asked Redic if she could go outside and roll up her vehicle's windows in case it started raining. Redic kept her car keys but allowed Y.M. to go outside under the pretense of rolling up her windows. Once outside, Y.M. called 911 and spoke to a dispatcher, explaining that she had been strangled, assaulted, and held hostage in her own residence. Y.M. testified that the police officers arrived before she had an

opportunity to inform the dispatcher that she had been raped.

{¶ 9} Fairborn Police Officer Joshua Lightner and Officer Sopher responded to Y.M.'s residence. When they arrived, Y.M. was standing in front of her residence waving them down. Officer Lightner testified that Y.M. had visible injuries to her neck and was crying. He left Y.M. with Officer Sopher, while he (Lightner) went inside the residence to locate Redic.

{¶ 10} Officer Lightner testified that, after entering the residence, he found Redic sleeping on the couch. Redic told the officer that he and Y.M. had argued that night, but he denied that any type of physical altercation had occurred. When Officer Lightner asked him how the argument ended, Redic stated that he "just stopped talking to her and went to bed." Redic claimed to know nothing about the injuries to Y.M.'s neck. After further questioning from Officer Lightner, Redic admitted that after they argued, he and Y.M. had "wrestled around." Redic also informed Officer Lightner that he and Y.M. had had sex, and then he went to bed. At this point, Officer Sopher called Officer Lightner back outside after Y.M. disclosed that she had been raped. Officer Lightner saw that Redic's hands were bleeding and he had blood on his shirt. Redic was then arrested and taken into custody while Y.M. was taken to the hospital where a rape kit was performed and she was treated for her injuries.

{¶ 11} On May 11, 2018, Redic was indicted on two counts of rape, in violation of R.C. 2907.02(A)(2), both felonies of the first degree (Counts I and II); one count of attempted felonious assault, in violation of R.C. 2923.02(A) and 2903.11(A)(1), a felony of the third degree (Count III); and one count of abduction, in violation of R.C.

2905.02(A)(2), a felony of the third degree (Count IV).

{¶ 12} The case proceeded to jury trial on November 5, 2018, after which Redic was found guilty of Count II. Redic was acquitted on the remaining counts. At disposition on December 14, 2018, the trial court sentenced Redic to a mandatory prison term of seven years for Count II. Redic was also designated a Tier III sex offender.

{¶ 13} Redic appealed, arguing that his conviction was against the manifest weight of the evidence. We affirmed his conviction in *Redic I*, 2d Dist. Greene No. 2019-CA-1, 2019-Ohio-3395, issued on August 23, 2019. On November 20, 2019, Redic filed an application to reopen his appeal, arguing that he had received ineffective assistance of counsel. We issued a decision denying his application for reopening on December 26, 2019.

{¶ 14} On January 28, 2020, Redic filed a "Post-Conviction Petition to Vacate or Set Aside Judgment of Conviction and Sentence." He requested the assistance of counsel and a hearing. In response, the State filed a motion to dismiss and a motion for summary judgment. On June 12, 2020, the trial court denied Redic's post-conviction petition, as well as his request for counsel and a hearing on his petition.

{¶ 15} On October 18, 2021, Redic filed a notice of appeal, a motion for leave to file a delayed appeal and a motion for appointment of counsel with respect to the trial court's decision denying his post-conviction petition. In two entries issued on November 10, 2021, we denied Redic's motions but allowed him to proceed with the instant appeal because his appeal was timely.

## II. Post-Conviction Relief

{¶ 16} Redic's sole assignment of error is as follows:

THE TRIAL COURT ERRED WHEN IT DENIED THE APPELLANT'S POST-CONVICTION PETITION BY MISAPPLYING THE *STRICKLAND* STANDARD TO THE EVIDENCE.

{¶ 17} Redic contends that the trial court erred when it denied his post-conviction petition, arguing that it misapplied the standard for ineffective assistance of counsel as set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Specifically, Redic argues that his trial counsel failed to investigate his case properly and failed to introduce impeachment evidence against Y.M.

### Post-Conviction Relief Standard

{¶ 18} Post-conviction relief is governed by R.C. 2953.21. The statute provides, in pertinent part, that "[a]ny person who has been convicted of a criminal offense * * * and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States, * * * may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. The petitioner may file a supporting affidavit and other documentary evidence in support of the claim for relief." R.C. 2953.21(A)(1)(a).

{¶ 19} "A post-conviction proceeding is not an appeal of a criminal conviction, but, rather, a collateral civil attack on the judgment." *State v. Stefen*, 70 Ohio St.3d 399, 410, 639 N.E.2d 67 (1994); *see also State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 48. To prevail on a petition for post-conviction relief, the defendant

must establish a violation of his constitutional rights which renders the judgment of conviction void or voidable. R.C. 2953.21.

{¶ 20} " 'In a petition for post-conviction relief, which asserts ineffective assistance of counsel, the petitioner bears the initial burden to submit evidentiary documents containing sufficient operative facts to demonstrate the lack of competent counsel and that the defense was prejudiced by counsel's ineffectiveness.' " *State v. Kapper*, 5 Ohio St.3d 36, 38, 448 N.E.2d 823 (1983), quoting *State v. Jackson*, 64 Ohio St.2d 107, 413 N.E.2d 819 (1980), syllabus.

{¶ 21} The post-conviction relief statutes do "not expressly mandate a hearing for every post-conviction relief petition and, therefore, a hearing is not automatically required." *State v. Jackson*, 64 Ohio St.2d 107, 110, 413 N.E.2d 819 (1980). Rather, in addressing a petition for post-conviction relief, a trial court plays a gatekeeping role as to whether a defendant will receive a hearing. *Gondor* at ¶ 51. A trial court may dismiss a petition for post-conviction relief without a hearing "where the petition, the supporting affidavits, the documentary evidence, the files, and the records do not demonstrate that petitioner set forth sufficient operative facts to establish substantive grounds for relief." *State v. Calhoun*, 86 Ohio St.3d 279, 714 N.E.2d 905 (1999), paragraph two of the syllabus; *Gondor* at ¶ 51. In the instant appeal, Redic does not challenge the trial court's denial of his requests for counsel and for a hearing regarding his post-conviction petition.

{¶ 22} We review the trial court's denial of a petition for post-conviction relief for an abuse of discretion. *Gondor* at ¶ 52. An abuse of discretion suggests the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5

Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). When applying an abuse of discretion standard, a reviewing court is precluded from simply substituting its own judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621, 614 N.E.2d 748 (1993).

### *Strickland* Standard

{¶ 23} "We review the alleged instances of ineffective assistance of trial counsel under the two prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Pursuant to those cases, trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. *Strickland* at 688. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. *Id.* Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." (Citation omitted). *State v. Mitchell*, 2d Dist. Montgomery No. 21957, 2008-Ohio-493, ¶ 31.

{¶ 24} An appellant is not deprived of effective assistance of counsel when counsel chooses, for strategic reasons, not to pursue every possible tactic. *State v. Brown*, 38 Ohio St.3d 305, 319, 528 N.E.2d 523 (1988). The test for a claim of ineffective

assistance of counsel is not whether counsel pursued every possible defense; the test is whether the defense chosen was objectively reasonable. *Strickland* at 688. A reviewing court may not second-guess decisions of counsel which can be considered matters of strategy. *State v. Smith*, 17 Ohio St.3d 98, 477 N.E.2d 1128 (1985). Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available. *State v. Cook*, 65 Ohio St.3d 516, 524, 605 N.E.2d 70 (1992).

### First Claim of Ineffective Assistance of Counsel

{¶ 25} In his first claim of ineffective assistance of counsel, Redic argues that his trial counsel failed to impeach Y.M.'s testimony regarding an inconsistency between a statement made by Officer Lightner that Y.M. had told him that Redic had strangled her, causing her to lose consciousness for a few minutes, and Y.M.'s denial of a loss of consciousness when taken to Soin Medical Center for treatment.

{¶ 26} Initially, we note that there was no testimony at trial from Officer Lightner that Y.M. told him that she lost consciousness when Redic strangled her. We further note that during both her direct testimony and her cross-examination, Y.M. affirmatively testified that she did, in fact, lose consciousness for a brief period when Redic strangled her on the night the incident occurred. However, Redic argues that a medical record from Soin Medical Center attached to Redic's post-conviction petition states that Y.M. denied losing consciousness when Redic strangled her.

{¶ 27} However, as found by the trial court in its decision denying Redic's post-conviction petition, Y.M.'s trial testimony was consistent with Defendant's Exhibit D which

was admitted at trial. Defendant's Exhibit D, an "Attempted Strangulation Documentation Worksheet" completed by medical professional who interviewed Y.M., contains the following question, "Did the patient lose consciousness?" The response ostensibly provided by Y.M. stated, "doesn't remember how long." The information contained in Defendant's Exhibit D, admitted at trial, essentially states that she lost consciousness, but could not recall the length of time that she was unconscious. Accordingly, we conclude that trial counsel did not act deficiently when he failed to attempt to impeach Y.M. using the alleged inconsistency between her testimony that she lost consciousness when she was strangled by Redic and the medical record from Soin.

{¶ 28} Additionally, we find that even if trial counsel had attempted to impeach Y.M. by using the medical record from Soin, the outcome of the trial would not have been any different given the nature of and substantial amount of evidence adduced at trial supporting Redic's conviction. Specifically, the State presented the testimony of Kathleen Hackett, a sexual assault nurse from SANE (Sexual Assault Nurse Examiners) of Butler County, Ohio. Hackett testified that she performed a sexual assault examination of Y.M. on May 4, 2018. Hackett indicated that Y.M. presented with visible injuries including swelling to her left cheek, as well as scratches and abrasions on the right side of her neck. In addition, Y.M. had a hematoma or swelling on her forehead and bruising on her right wrist. Y.M. also suffered an injury to her anus called an anal prolapse, which is where "[t]he folds of the anus are prolapsed outside the anus" and "that's usually seen with forceful penetration." Tr. 219. Hackett further testified that an anal prolapse has occurred "when the inner folds are pulled out of the anus * * * the

sphincter muscle * * * in the case half of it was pulled out. * * * It was just solid and swollen red. * * * It's outside – outside the body – or outside where it should be." Tr. 220.

{¶ 29} The State also presented the testimony of Hallie Dreyer, a forensic scientist with the Ohio Bureau of Criminal Investigation. Dreyer conducted a DNA analysis of the swabs taken by Hackett for Y.M.'s rape kit. Dreyer testified that based upon the DNA found on the anal swabs and a swab of Y.M.'s right buttock, Redic could not be excluded as a contributor to the male DNA found on the swabs. Additionally, Dreyer testified that there was no foreign DNA from any other males on the samples taken by Hackett. In light of the foregoing, we find that trial counsel was not ineffective for failing to impeach Y.M.'s testimony using the medical record from the Soin Medical Center.

### Second Claim of Ineffective Assistance of Counsel

{¶ 30} In his second claim of ineffective assistance of counsel, Redic argues that his trial counsel was deficient for failing to call Detective Alan Kraker as a defense witness at trial or to object to the State's failure to call Detective Kraker at trial. Redic contends that had Detective Kraker been called to testify at trial, his testimony "would have clearly demonstrated the victim's perjury, or falsification and prior inconsistent statements." Post-Conviction Petition p. 5; Appellant's Brief p. 7-8.

{¶ 31} Redic, however, fails to articulate what, if any, relevant testimony Detective Kraker could have provided. Simply put, Redic's argument that Detective Kraker should have been called to testify rests upon "mere speculation." *State v. Short*, 129 Ohio St.3d 360, 2011-Ohio-3641, 952 N.E.2d 1121, ¶ 119. "Such speculation is insufficient to establish ineffective assistance." *Id.*, citing *State v. Perez*, 124 Ohio St.3d 122, 2009-

Ohio-6179, 920 N.E.2d 104, ¶ 217.

{¶ 32} Furthermore, the Fairborn Police Department Narrative Supplement authored by Detective Kraker establishes that Y.M. told him that Redic grabbed her hair and neck, slammed her to the floor, strangled her, slapped her, forced her to undress, shoved his fingers into her vagina, and raped her anally. State's Trial Exhibit G. Redic fails to identify any inconsistencies between Y.M.'s testimony at trial and her statements to Detective Kraker that he put in the Narrative Supplement. Additionally, had Detective Kraker been called to testify at trial, his testimony would more than likely have been consistent with his report. Therefore, it would have been extremely harmful to Redic's defense, as Detective Redic's testimony would have bolstered the testimony provided by Y.M.

{¶ 33} Finally, trial counsel was not ineffective for failing to object to the State's decision not to call Detective Kraker to testify at trial. The State had no duty to call Detective Kraker or any other witness to testify on its behalf. Therefore, any objection from the defense regarding the State's decision not to call Detective Kraker to testify would have been fruitless. Significantly, Redic has failed to provide us with any authority in support of his argument in this regard. Accordingly, trial counsel's decision not to call Detective Kraker as a witness at trial did not amount to ineffective of counsel.

### Third Claim of Ineffective Assistance of Counsel

{¶ 34} Next, Redic argues that his trial counsel was ineffective for failing to introduce records at trial from Eastway Medical Center and from the Dayton Police Department (DPD) concerning Y.M.'s mental health, as well as failing to call Eastway

employee Dr. Jason Wiseman with respect to Y.M.'s mental health. Redic argues that trial counsel could have used Dr. Wiseman's testimony and the medical records to impeach Y.M.'s testimony that she did not did not suffer from any mental health disorders other than anxiety at the time of the incident.

{¶ 35} During trial, Y.M. testified to past instances of drinking alcohol and smoking marijuana, but she testified consistently throughout the trial that she was sober on the night of the incident. Y.M. also testified that she did not have any concerns regarding her mental health, though she admitted to being diagnosed as a child with bipolar disorder, post-traumatic stress disorder (PTSD), and anxiety. Although the records were never admitted into evidence, defense counsel was permitted to question Y.M. regarding old medical records from Eastway Behavioral Health which indicated that Y.M. had in fact been diagnosed with bipolar disorder, schizophrenia, and PTSD. Redic also presented medical records from a visit to Kettering Hospital in August 2018, which indicated that Y.M. had been diagnosed with schizoaffective disorder. While trial counsel did not call Dr. Wiseman to testify at trial, Redic has only provided us with speculation regarding the contents of his potential testimony.

{¶ 36} Additionally, Redic presented the testimony of Dr. Julie Walsh-Messinger, a clinical psychologist employed by the University of Dayton and an expert on schizophrenia and related disorders. Messinger had never treated or even met Y.M. Nevertheless, Messinger testified that schizophrenia is a chronic disorder marked by symptoms such as hallucinations, lack of affect, social withdrawal, and unclear thought processes. Messinger further stated that schizoaffective disorder includes

schizophrenia coupled with episodes of depression or mania. Messinger indicated that those individuals suffering from the disorder may exhibit fixed, but false, beliefs. The disorder can also affect memory and may result in "circumstantial or tangential speech," which Messinger described as becoming easily distracted when speaking with others while constantly shifting the focus of the conversation.

**{¶ 37}** In regards to the report from DPD, that document purportedly states that Y.M. was on Social Security disability for bipolar disorder and schizophrenia. However, trial counsel was able to get substantial evidence admitted at trial regarding Y.M.'s mental illnesses without using the report from DPD. Upon review, we conclude that Redic's counsel was not ineffective for failing to use the report from DPD or the potential testimony of Dr. Wiseman to impeach Y.M.'s testimony as it related to her mental health.

**{¶ 38}** Redic's sole assignment of error is overruled.

### III. Conclusion

**{¶ 39}** The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

WELBAUM, J. and LEWIS, J., concur.

Copies sent to:

Megan A. Hammond
Jerad Redic
Hon. Michael A. Buckwalter